

U.S. Department of Justice

*United States Attorney*
*District of New Jersey*

---

*970 Broad Street, 7th floor*   973-645-2700
*Newark, New Jersey 07102*

March 3, 2021

**Via Email & ECF**

The Honorable James B. Clark, III
United States Magistrate Judge
Martin Luther King Jr. Federal Building and U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

      Re:  *United States v. Joseph Rubino*, Mag. No. 19-6293 (SCM)

Dear Judge Clark:

    Defendant Joseph Rubino (hereinafter "Rubino" or "Defendant") seeks release from federal custody in light of his underlying medical conditions and the COVID-19 pandemic. Defendant seeks temporary release pursuant to 18 U.S.C. § 3142(i). For the reasons set forth below, the Government respectfully requests that the Court deny Defendant's motion.

    **I.  Background**

    On or about July 24, 2019, members of the New Jersey State Police responded to the scene of a motor vehicle accident involving Rubino, who was the driver of the motor vehicle. In the process of extracting Rubino from the motor vehicle in order to render medical treatment, law enforcement observed, among other things, various firearms and ammunition inside Rubino's vehicle.

    Law enforcement subsequently obtained a search warrant authorizing the search of Rubino's vehicle. This search revealed, among other things, the following items:

    a.  An Intratec Arms Model TEC-DC9 semi-automatic assault handgun, bearing serial number D062728, with threaded barrel attachment;

 b. A Cobray Arms Mac-11 9mm semi-automatic assault pistol, bearing serial number 89-0057884, with a high capacity magazine;

 c. A loaded Smith & Wesson M&P pistol, bearing serial number HLJ4405;

 d. Two (2) sawed-off double-barrel shotgun barrels;

 e. An assault rifle sight;

 f. A stripped AR-15 bolt carrier;

 g. Various ammunition including, but not limited to:
  a. a high capacity magazine with twelve (12) 9mm solid point cartridges;
  b. a 9mm hollow point cartridge;
  c. a 7.62mm rifle cartridge;
  d. an FC 9mm Luger cartridge;
  e. four (4) 9mm solid point cartridges, and;
  f. two (2) 9mm luger hollow point cartridges.

 h. A set of brass knuckles, and;

 i. A wooden ax handle, a wooden baseball bat, and a wooden club;

Law enforcement subsequently executed a court-authorized search warrant at Rubino's residence which revealed, among other things, the following items:

 a. A Keltec CMR30 .22 caliber semi-automatic rifle, bearing serial number Y3Z02, loaded with sixteen (16) .22 caliber hollow-point cartridges;

 b. A Keltec PF9 9mm semi-automatic handgun, bearing serial number SZ968;

 c. A High Standard Derringer .22 caliber double-barrel handgun, bearing serial number 2038167;

 d. A Polymer 80 9mm semi-automatic handgun, bearing serial number STSOO 147;

 e. An RG .22 caliber revolver, bearing serial number 176542;

f. An Ithaca M-66 20-gauge single shotgun, bearing serial number 660037422;

g. A Remington Model 700 .223 caliber bold action rifle with scope, bearing serial number 07017868;

h. A Thompson Center .50 caliber muzzle-loading rifle with scope, bearing serial number 110545;

i. A Remington Model 870 Wingmaster 12-gauge pump shotgun, bearing serial number $03 1228V;

j. A New England Firearms 20-gauge single shot shotgun, bearing serial number NH247500;

k. A Remington Model 760 .300 Savage pump rifle, bearing serial number 217690;

l. A Glenfield Mod 60 .22 LR caliber semi-automatic rifle, bearing serial number 23434391;

m. An assault rifle of unknown make/model;

n. A handgun of unknown make/model;

o. Approximately 4 high-capacity magazines;

p. Approximately sixty (60) silencer tubes and baffles;

q. Various additional ammunition and firearms parts;

r. An East Coast Machine and Tool grenade launcher;

s. A ballistic vest;

t. Approximately 200 cannabis vape cartridges and numerous THC edibles;

u. Approximately three (3) kilograms of marijuana; and

v. Suspected Methamphetamine.

The marijuana and methamphetamine were recovered in the same "safe" area as several of the weapons and ammunition described above.

In addition, during the lawful search of Rubino's vehicle and residence, law enforcement recovered the following items: (1) a box containing clothing and bumper stickers with, among other things, "SS Bolts," which are common white supremacist and neo-Nazi symbols that are sometimes used by outlaw motorcycle gang members; (2) a document entitled N****r Owner's Manual," containing racist material and purporting to be an instruction manual for owning a slave.

On August 22, 2019, this Court was asked to release the Defendant, arguing that he posed no danger to the community nor a flight risk and needed medical attention for the injuries he suffered as a result of the car accident which led to these charges. The Government opposed that request and argued for detention as the Defendant posed a great risk to the community and was receiving medical care while incarcerated. The Court denied the Defendant's motion and ordered for the Defendant to remain detained.

On October 9, 2019, this Court was asked, once again, to release the Defendant. At that time, the Defendant argued that the evidence against him, that being the multitude of weapons, drugs, and hate speech paraphernalia, had been misconstrued by the Government and there was an innocent explanation for everything that the Defendant had. For example, the Defendant was in possession of a firearms owner permit obtained prior to his felony conviction and did not know that the permit was no longer valid, some of the firearms could have belonged to the gravely injured passenger who was in the vehicle at the time of the accident[1], and the methamphetamine was for personal use. The Defendant also presented the Court with Kurt Zitzler, a person that worked at gun trade shows with the Defendant, as a character witness and co-signer on an unsecured bond for the Defendant.

Once again, the Government opposed the request for release and argued that the Defendant continued to pose a danger to the community as well as a flight risk. The Court denied the Defendant's motion and ordered for the Defendant to remain detained.

Since that time, Kurt Zitzler has been charged and arrested in the Eastern District of Pennsylvania ("E.D.Pa.") for alleged firearms offenses he committed with the Defendant. The Defendant is also under indictment in the E.D.Pa. for selling "firearm conversion kits" during gun trade shows in that jurisdiction. That is, the Defendant was actively engaged in the sale of kits that would allow the purchaser to convert a semi-automatic firearm into a fully automatic firearm with no questions asked.[2]

---

[1] There is no evidence to support this assertion and the vehicle was owned by the Defendant.

[2] During the April 23, 2020 hearing before The Hon. Judge Vazquez, the Defendant admitted to engaging in this conduct.

On March 23, 2020 the Defendant was provided with a plea offer from this office which anticipates a significant amount of jail time.

On April 2, 2020 the Defendant filed an affidavit with his appeal of this Courts decision to detain him. In this affidavit the Defendant cited to his medical conditions of high blood pressure and hepatitis C in conjunction with the coronavirus pandemic as a basis for release. *See* Govt. Ex. A – Def. Submission on 4/2/20. The Government opposed release as the Hudson County Correctional Center ("HCCC") was adequately addressing his health concerns and needs and the Defendant posed a significant danger to the community. *See* Govt. Ex. B – Govt. Submission on 4/3/20.

On April 23, 2020, The Hon. John Michael Vazquez, U.S.D.J., heard argument on the appeal before ordering the Defendant detained pursuant to § 3142(f)(2), finding that no condition or combination of conditions could ensure the safety of the community and Defendant's appearance at future proceedings and denying the Defendant's motion for emergency release pursuant to § 3142(i), finding that the specific health risk of COVID-19 to the defendant was not a "compelling reason" necessitating release.

On May 15, 2020, the Defendant filed a Motion for Reconsideration of the denial of his appeal to The Hon. Judge Vazquez. The Defendant continued to cite his health and the risk that coronavirus poses to him. *See* Gov. Ex. C – Def. Submission on 5/15/20. On May 22, 2020, the Government opposed release on the basis that the Defendant presented no new or changed circumstances. In addition, the Government brought to light misrepresentations that the Defendant had made to the Court and to the Government for his benefit. *See* Gov. Ex. D – Govt. Submission on 5/22/20.

On May 29, 2020, The Hon. Judge Vazquez once again, heard argument on the matter before deciding that the Defendant presented no new evidence and denying the motion in its entirety.

The Defendant now asks for this Court to give a fifth consideration towards his motion for release and continues to cite his medical condition and concerns over the current COVID-19 pandemic as a reason for this release.

The Government respectfully submits that the present motion for reconsideration does not, in any material way, alter the Court's prior analysis.

### II. COVID-19 and the Hudson County Jail

The Defendant asserts that the HCCC is ill-equipped to address his medical needs while, in the same breath, stating that he has had an EKG, visited with specialists and is awaiting another visit with a specialist as HCCC addresses

his medical needs. In fact, the Defendant has been incarcerated since the inception of the epidemic and has not contracted COVID-19. Clearly, the precautions taken by the HCCC are working in preventing the spread of the virus.

Attached, is the 28th Amended Declaration of Director Ron Edwards at the HCCC which outlines the procedures and precautions being taken at the facility to ensure the safety of the inmates and employees. *See* Govt. Ex. E – 28th Amended Dec. of Dir. Edwards.

Like many correctional centers across the country, the Hudson County Jail initiated a facility wide lockdown on March 22, 2020, in order to quarantine the entire inmate/detainee population for a period of two weeks. While unprecedented, the Facility deemed this lockdown necessary in light of two positive COVID-19 test results of inmates. The medical department at the HCCC has implemented screening procedures for all new commitments prior to their entrance to the secured area of the Facility. Should any new commitment not meet the criteria for admission, the arresting jurisdiction is required to immediately transport that individual to the nearest emergency room for medical treatment. Further, all staff members are subject to temperature scans prior to entering the Facility. In addition to these preventative measures, the Hudson County Jail has posted CDC and Department of Health educational fliers and posters throughout the Facility and in its front lobby in order to provide information about measures that can be taken to prevent the spread of the virus.

The HCCC has similarly altered its practices for food preparation, visits, and cleaning. With respect to food preparation and handling, as well as delivery of meal trays to the inmate population, the use of inmate/detainee trustees has been suspended. Rather, all of these tasks are now being handled by civilian staff. This is likewise the case for collection and cleaning of food trays, work areas, and garbage removal. In addition, prepackaged foods remain available with minimal amount of human interaction required. As for visits, the Facility has suspended all contact and non-contact visits until further notice. The Facility is allowing visits from attorneys, professionals, family, and friends via video conference. The Facility is disinfecting the handset prior to and after each use of the video conferencing equipment in order to ensure sanitary conditions. With respect to the cleaning practices at the Hudson County Jail, the Facility has contracted with a private vendor to service deep cleaning and sanitation throughout the Facility twenty-four hours a day, seven days a week.

Since the time that eleven inmates tested positive, the HCCC has received and administered the vaccine to a large portion of the prison population. At this time, there are no active cases at the HCCC.[3]

### III. Analysis

As the Court is aware, the Bail Reform Act establishes that the Court "shall order the pretrial release" of a defendant "unless the judicial officer determines that such release will not reasonably assure the appearance" of the defendant or "will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Section 3142(g), in turn, provides several factors that this Court must consider in making that determination, including "the nature and circumstances of the offense charged" and "the history and characteristics" of the defendant. Here, there is a rebuttable presumption in favor of detention. 18 U.S.C. §§ 3142(e)(2), 3142(e)(3).

Separately, § 3142(i) establishes that the Court "may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." While "there is limited authority as to when temporary release is justified under § 3142(i) based on 'another compelling reason,' . . . a defendant's medical condition may present that compelling reason in a particular case." *United States v. Clark*, Mag. No. 19-40068, 2020 U.S. Dist. LEXIS 51390, at *6 (D. Kan. Mar. 25, 2020) (citing *United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (noting the defendant could seek temporary release under § 3142(i) for medical reasons)). "'The standard imposed by the statute is one of necessity, not convenience.'" *United States v. Aponte-Lebron*, Crim. No. 20-30, 2020 U.S. Dist. LEXIS 53957, at *5 (E.D. Wis. Mar. 25, 2020) (quoting *United States v. Bolze*, Crim. No. 09-93, 2010 WL 199978, at *2 (E.D. Tenn. Jan. 13, 2010)).

This subsection "has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *United States v. Hamilton*, Crim. No. 19-54, 2020 U.S. Dist. LEXIS 49095, at *5 (E.D.N.Y. Mar. 20, 2020). For instance, in *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y 1993), the court permitted release of a defendant under the twenty-four-hour guard of the United States Marshal Service—at his own expense—after he had "sustained a gunshot wound that destroyed his left eye and surrounding area of his face and skull," and after it was determined that "he would 'shortly die' from terminal AIDS," *Clark*, 2020 U.S. Dist. LEXIS 51390, at *6-7 (citing *Scarpa*, 815 F. Supp. at 88). Critically, in *Scarpa*, "correctional authorities could

---

[3] *See* https://www.nj.com/hudson/2021/01/vaccinations-underway-at-hudson-county-jail.html (last visited on March 3, 2021).

no longer manage his medical needs." *Id.* at *7; *see also United States v. Cordero-Caraballo*, 185 F. Supp. 2d 143, 144-47 (D.P.R. 2002) (ordering release of defendant who had sustained multiple gunshot wounds, was partially paralyzed, had lost some arm function, had a wound the size of a fist, required four to five contracted security guards to supervise him, and the Bureau of Prisons could not provide the medical care that he required).

In recent months, courts throughout the country have addressed bail motions premised on COVID-19 in the context of § 3142(i). As set forth herein, these cases—as well as the familiar framework of the Bail Reform Act—support denial of the present motion.

### A. Rubino is Not Entitled to Temporary Release Pursuant to Section 3142(i).

Defendant has explicitly sought temporary release under § 3142(i), the Government submits that such relief is unwarranted. As noted, courts have used this provision "only 'sparingly to permit a defendant's release'" in circumstances involving "terminal illness or serious injuries." *Clark*, 2020 U.S. Dist. LEXIS 51390, at *6. Informatively, numerous courts have analyzed § 3142(i) in the context of COVID-19 concerns in the past several months. As set forth below, review of these decisions demonstrates that Anderson is not entitled to release.

As a threshold matter, the Government does not dispute that Rubino suffers from hepatitis-C, hypertension or obesity as this was established in prior bail hearings. Neither of these conditions, either alone or in tandem, pose a heightened risk should the Defendant contract COVID-19.[4] The Defendant now claims to suffer from an unspecified kidney disorder, asthma and hyperlipidemia. Regardless, asthma and hyperlipidemia do not present a risk and, should the Defendant have a kidney disorder, HCCC is clearly equipped to address this as the Defendant has maintained his health since his incarceration. Courts have uniformly concluded that they "must make an individualized determination as to whether COVID-19 concerns present such a compelling reason in a particular case that temporary release is necessary under § 3142(i)." *Clark*, 2020 U.S. Dist. LEXIS 51390, at *10. In making that determination, courts have considered various factors, including: "(1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks

---

[4] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited on March 3, 2021).

to others." *Id.* In this case, these considerations, among others, weigh in favor of detention.

First, the original grounds for Rubino's pretrial detention are, as set forth above, significant. The Court's prior finding that the arsenal of firepower and other weapons combined with the drugs and evidence of participation in a hate group demonstrate that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community remains unaltered. On two separate occasions, The Hon. Judge Vazquez has agreed with this Court's findings.

Defendant's argument that he has never committed an act of violence does not hold water when the Defendant actively enabled others to conduct acts of violence. The Defendant sold illegal firearms and firearm conversion kits at gun shows to people whose intention was unknown to the Defendant, nor did the Defendant care. That the Defendant himself was not pulling the trigger is of little comfort to the Government.

This Court should also take into consideration the fact that all of Rubino's criminal associates have not been identified. The Defendant presented this Court with Kurt Zitzler as a character witness at a time when Mr. Zitzler was continuing to engage in the criminal conduct he had started with the Defendant. Mr. Zitzler now has a pending criminal indictment.

Second, while Defendant has established that he suffers from medical issues this in itself does not warrant release. Notably, Rubino does not allege that he received inadequate medical care while incarcerated but, rather, has to wait for doctor's appointments. The Defendant would have to do the same if he were amongst the general public. *Cf. Sacal-Micha v. Longoria*, Civ. No. 20-37, 2020 U.S. Dist. LEXIS 53474, at *5 (S.D. Tex. Mar. 27, 2020) (denying request for release of sixty-nine-year-old immigration detainee with several documented health conditions, noting that he did not allege that he received inadequate care for his current medical conditions). And while a kidney disorder is an underlying condition that may make Rubino more susceptible to complications, the Government is not aware of any decision, in which a court has released a defendant based on a risk of exposure to COVID-19 and a diagnosis of a kidney disorder.

In *United States v. Green*, Crim. No. 19-85, 2020 U.S. Dist. LEXIS 53440, at *3 (W.D. Pa. Mar. 27, 2020), the defendant "contend[ed] that he is at a much graver risk of contracting COVID-19" while incarcerated, as opposed to on home confinement, and "that he is particularly vulnerable because he has a documented history of asthma." The court "recognize[d] the potential for [defendant's] exposure to the COVID-19 virus" while in custody, but it aptly noted that "[u]nfortunately, that potential exists anywhere in the community."

*Id.* at *4. While the facility in which Green was housed did not have any positive cases at the time of the court's decision, the court's analysis applies equally here. *See id.* As was the case in *Green*, the Hudson County Jail, "along with this court and other local authorities, ha[s] taken the necessary steps and precautions to help stop the spread of the COVID-19 virus amongst the [inmate] population." *Id.* "Additionally, there is no indication that [defendant's] medical needs are not being addressed." *Id.* While the court was "sympathetic to [defendant's] medical concerns and claims regarding possible complications caused by the COVID-19 virus, such speculation concerning possible future conditions does not constitute a 'compelling reason' for temporary release." *Id.*

Similarly, in *United States v. Jones*, Crim. No. 19-249, 2020 U.S. Dist. LEXIS 54267, at *7 (W.D. Pa. Mar. 29, 2020), the court concluded that, notwithstanding a history of asthma, in addition to hypertension and severe sleep apnea syndrome, the defendant had "not met his burden to demonstrate the existence of compelling reasons that warrant his temporary release." The court based this decision on numerous factors, including the lack of any "indication that defendant's medical needs are not being addressed at the" county jail. *Id.* at *8. After acknowledging the defendant's pre-existing health conditions, which included asthma, and noting that "individuals with respiratory issues are at a higher risk for COVID-19," the court nevertheless concluded that the defendant's "present health conditions are not sufficient to establish a compelling reason for release given the danger to the community if he is released and the efforts being undertaken at the [facility] to combat the spread of the virus." *Id.*

Other courts have reached this conclusion in other procedural postures. *See, e.g., United States v. Davis*, App. No. 19-1604, ECF. No. 50 (3d Cir. Mar. 20, 2020) (denying request for release pending appeal for sixty-nine-year-old with asthma, heart arrhythmia, high blood pressure, and history of prostate cancer); *United States v. Thompson*, Crim. No. 19-40014, 2020 U.S. Dist. LEXIS 51272 (W.D. Ark. Mar. 25, 2020) (denying request for release pending sentence for sixty-seven-year-old with Chronic Obstructive Pulmonary Disease ("COPD"), which is a chronic inflammatory lung disease that causes obstructed airflow in the lungs). Further, other courts have reached this conclusion with differing health conditions. *See, e.g., Aponte-Lebron*, 2020 U.S. Dist. LEXIS 53957, at *4-6 (denying request for pretrial release based on diabetes and COVID-19 because defendant "has not shown that the [facility in which he is housed] is not meeting his medical needs in the face of the threat, that the jail is not reasonably protecting him, or that the jail would not provide appropriate care were he to become ill"); *Clark*, 2020 U.S. Dist. LEXIS 51390, at *18 (denying request for pretrial release based on diabetes and COVID-19 and, in doing so, noting that defendant's "diabetes presents a specific COVID-19 risk, but the remainder of his arguments about incarceration are too speculative or generalized to favor release"); *Hamilton*, 2020 U.S. Dist. LEXIS 49095, at *4-5 (denying request for

pretrial release premised on advanced age and generalized health concerns, including dementia and history of stroke and heart attack). And unsurprisingly, courts have routinely denied requests for release when no specific health condition is at issue. *See, e.g., United States v. Simpson*, 19-197, 2020 U.S. Dist. LEXIS 54006, at *2, *4 (W.D. Pa. Mar. 27, 2020) (denying request for pretrial release for defendant who "did not present any evidence of a personal health condition that would make him uniquely susceptible to COVID-19" because "speculation concerning possible future conditions does not constitute a 'compelling reason' for temporary release"); *United States v. Bastianelli*, Crim. No. 17-305, 2020 U.S. Dist. LEXIS 53441, at *3-4 (W.D. Pa. Mar. 27, 2020) (denying request for pretrial release for defendant who "specifies no compelling reason for release, such that he suffered from a serious health condition which places him at higher risk for contracting the COVID-19 virus, and only argues that the virus poses a risk to him and to other inmates and his ability to meet and communicate with his counsel has been thwarted by this pandemic").

While some courts have granted requests for relief, these cases are easily distinguishable. *See, e.g., United States v. Brandon*, Crim. No. 19-644, 2020 U.S. Dist. LEXIS 50794 (S.D.N.Y. Mar. 24, 2020) (granting request for release pending sentence given the anticipation of a sentence of time served and his underlying health condition of HIV); *United States v. Fellela*, Crim. No. 19-79, 2020 U.S. Dist. LEXIS 49198 (D. Conn. Mar. 20, 2020) (granting request for release pending sentence of a sixty-two-year-old diabetic following his plea of guilty to charges of access device fraud and aggravated identity theft, as well as sentencing for violation of the conditions of supervised release from a prior federal criminal conviction, due to "his peculiar vulnerability to harm from the COVID-19 virus" and the court's conclusion that he was not a flight risk or a danger to the community); *United States v. Perez*, 2020 U.S. Dist. LEXIS 51867 (S.D.N.Y. Mar. 19, 2020) (granting temporary release for sixty-five-year-old with progressive lung disease and other significant health issues); *United States v. Stephens*, Crim. No. 15-95, 2020 U.S. Dist. LEXIS 47846 (S.D.N.Y. Mar. 18, 2020) (granting request for release pending hearing on violation of supervised release in the wake of newly discovered evidence that severely weakened the Government's case and due to fact that hearing was scheduled for six days later and defendant needed to confer with counsel in order to prepare); *United States v. Kennedy*, Mag. No. 18-20315, 2020 U.S. Dist. LEXIS 53359 (E.D. Mich. Mar. 27, 2020) (granting request for release for defendant with high blood pressure, thyroid, and blood sugar condition when facility failed to provide medications for these pre-existing conditions throughout incarceration and defendant was presently exhibiting untreated flu-like symptoms, such that he was "audibly ill with congestion").

In all, Rubino does not present with the age, health, or sentencing exposure profiles of those who have been released. To the contrary, his case and his claims fall squarely within the series of cases in which relief has been denied.

With respect to the third consideration—"the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant," *Clark*, 2020 U.S. Dist. LEXIS 51390, at *10—this likewise does not support release. As was the case in *Clark*, Defendant's "proposed release plan addresses only isolated aspects of public health officials' recommendations while ignoring other risk factors that would arise if he were released from custody." *Id.* at *19. The Facility "provides around-the-clock medical care, is staffed and trained to contain or treat the virus, and communicates with government partners and health agencies to keep those in its care safe and healthy." *Id.* Notably, "[t]he record is void of any information that the facility would be unable to render appropriate treatment to defendant were he to become ill." *Id.* at *20. At best, "this factor is neutral." *Id.* at *22.

Finally, as for "the likelihood that the defendant's proposed release would increase COVID-19 risks to others," *id.* at *10, this consideration weighs in favor of detention. "A defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers, . . . pretrial services officers . . ., and others if that individual is taken back into custody." *Id.*; *see also id.* at *23 ("[S]upervising such a high-risk offender out in the community will place pretrial services officers at heightened risk of contracting the virus."); *id.* at 25 ("[I]f he were released, he simply would be trading one set of problems (*e.g.*, reduced opportunities for social distancing []) for another set of problems (*e.g.*, contamination risks associated with travel and being in an uncontrolled environment, and potentially reduced access to quality healthcare).").

As a practical matter, the Defendant's proposed release plan is moot as the E.D.Pa. authorities have filed a custody detainer against him. Therefore, should he be released from this jurisdiction he will simply be transferred to the custody of another.

On balance, Rubino has not established compelling reasons that warrant his release, temporary or otherwise, under any framework set forth in the Bail Reform Act. To the contrary, this Court's prior analysis under § 3142(f) remains unaltered, and cases that have analyzed similar claims in the context of § 3142(i) demonstrate that release is unwarranted based on the circumstances at hand.

### IV.   Conclusion

The COVID-19 crisis is indisputably challenging, but its effects are not so compelling in the specialized circumstances of this case, as applied to Defendant, so as to warrant a change in his detention status at this time. *See United States v. Gabelman*, Crim. No. 20-19, 2020 U.S. Dist. LEXIS 52773, at *1 (D. Nev. Mar. 23, 2020) ("The court acknowledges that the spread of COVID-19 may be acutely possible in the penological context, but the court cannot release every detainee at risk of catching COVID-19 because the court would be obligated to release

every detainee."). While there have been Government efforts to reduce pretrial inmate populations in light of COVID-19, these efforts have centered on low-risk, minor offenders or probation violators, not those, like Defendant, who face lengthy—and mandatory—terms of imprisonment. For inmates like Rubino the HCCC has implemented reasonable precautionary and monitoring practices in an effort to protect detainees from excessive exposure to the COVID-19 virus.

In light of the above, the Government respectfully submits that Defendant cannot overcome this Court's prior finding that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community, and the circumstances occasioned by the COVID-19 virus do not compel temporary release at this time. Consequently, the Government respectfully requests that the Court deny Defendant's motion.

                                      Respectfully submitted,

                                      RACHAEL HONIG
                                      Acting United States Attorney

By:   Naazneen Khan
        Assistant U.S. Attorney

Cc:   Linda Foster, Esq. (via e-mail)